UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| MINNIE HARRISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:14 CV 43 DDN |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Minnie A. Harrison for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, et seq., 42 U.S.C. § 1381, et seq. For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## **I. BACKGROUND**

Plaintiff filed her applications on November 4, 2010. (Tr. 226-38.) She was born in 1959 and alleged that she became disabled beginning July 1, 2010 due to chronic depression, chronic back pain, degenerative disc disease, and osteopenia, i.e., bone mineral density that is lower than normal. (Tr. 232, 301.)

Plaintiff's claims were denied initially. (Tr. 123-24, 129-35.) On April 24, 2013, following a hearing, the ALJ found that plaintiff was not "disabled" as defined under the Act. (Tr. 7-26.) The Appeals Council denied her request for review. (Tr. 1-6.) Therefore, the ALJ's decision stands as the final decision of the Commissioner subject to review.

## II.  MEDICAL AND OTHER HISTORY

Plaintiff saw Ted Oliver, MSW, LCSW, for an evaluation in conjunction with her application for Medicaid on October 26, 2010.  Mr. Oliver noted that plaintiff had recently moved to Missouri.  She reported a history of depression since she was eight or nine years old, but had never received mental health treatment from a psychiatrist, only with general practitioners.  She had one psychiatric hospitalization related to her depression in 1991.  Examination by Mr. Oliver showed a flat affect, depressed mood, poor recent memory and concentration, and monotonous speech.  She showed normal hygiene, fair remote memory, normal judgment and insight, and average intellect.  She was taking Prozac, an anti-depressant, with little benefit for the past four years, and had recently started Trazodone for insomnia.  Mr. Oliver diagnosed severe major depression with psychotic features and assessed a global assessment of functioning score (GAF) score of 50, indicating "serious" symptoms.  (Tr. 353-54.)

On February 24, 2011, plaintiff underwent a physical consultative examination for disability determination by Gregory L. Henry, D.O., an orthopedist.  Plaintiff's eye contact was poor.  Her affect was flat.  Otherwise, she attempted to be pleasant and cooperative.  Dr. Henry believed that plaintiff would be capable of sustaining a 40-hour workweek on a continuous basis and that she would have no restrictions on her ability to complete mild to light demand activities.  He believed that plaintiff had the upper extremity strength to accomplish light work without difficulty and that she would have no restrictions in her ability to sit.  Due to her alleged discomfort with bending, Dr. Henry recommended "very light" demand duties with regard to bending and lifting.  From a physical standpoint, Dr. Henry found no restrictions based on his findings with her ability to complete mild to light demand activities.  Dr. Henry diagnosed depression, chronic back pain, degenerative disc disease, and osteopenia.  (Tr. 363-68.)  Dr. Henry also performed a mini-mental status examination to quantify cognitive function and screen for cognitive loss.  Plaintiff received a score of 30, the maximum score possible.  (Tr. 357-59.)

On March 14, 2011, Mark Altomari, Ph.D., a psychological consultant, conducted a Mental Residual Functional Capacity (RFC) Assessment. Dr. Altomari opined that plaintiff retained the ability to understand, remember, and carry out complex instructions, could relate appropriately to coworkers and supervisors in small numbers and for brief periods, could adapt to most usual changes common to a competitive work environment, and could make simple work-related decisions. He found plaintiff had no significant limitations with the exception of moderate limitations in her ability to interact appropriately with the general public and the ability to respond appropriately to changes in the work setting. (Tr. 369-71.) Dr. Altomari also completed a Psychiatric Review Technique, concluding that plaintiff did not meet the presence of the "C" criteria required for a mental disorder. (Tr. 372-83.)

Plaintiff saw Mr. Oliver again on July 24, 2012, for an evaluation concerning Medicaid coverage. She was living at a women's shelter at the time. She stated she was irritable, and at times having trouble crying and hearing a female voice. She was slightly withdrawn with a bland affect and somewhat monotonous speech, but was fully oriented. Her thoughts were clear and goal directed. Her insight and judgment were normal, and she had no psychomotor agitation or retardation. Her concentration was fair, as was both recent and remote memory. Plaintiff told Mr. Oliver that she could no longer work due to physical health problems. She was currently under the care of Jeffrey Wells, D.O., her primary care provider, and was taking Prozac, Trazodone, a muscle relaxant, and Hydrocodone, for pain. She smoked one half pack of cigarettes per day and used an inhaler. Mr. Oliver diagnosed major depression and panic disorder, and assessed a GAF score of 45, indicating "serious" symptoms. (Tr. 399-400.) David Goldman, D.O., signed the assessments and completed state forms, opining that plaintiff was permanently disabled for purposes of obtaining Medicaid. (Tr. 353-54, 399-400.)

On July 20, 2011, plaintiff saw Dr. Wells, her primary care provider, for a general four month checkup. She was doing okay except that her right sciatica was bothering her. (Tr. 417.) She saw Dr. Wells again on October 21, 2011, for a flu shot and for pain in her

tailbone and low back. She had fallen one week earlier while in the back of a pickup truck helping to lift an oxygen tank. (Tr. 414.) She saw Dr. Wells again on February 1, 2012 for headaches, and on March 7, 2012, for sinusitis. (Tr. 408-13.) During an August 29, 2012 appointment with Dr. Wells, plaintiff requested medication for anxiety and sleep, while examination showed she was alert and in no acute distress, and no psychiatric abnormalities were documented. (Tr. 404-05.) At an October 25, 2012 appointment for a head cold, plaintiff had no complaints of depression or anxiety. Examination showed she was alert and oriented with intact insight and judgment, and had a "normal" affect. (Tr. 428-29.)

In Function Reports dated November 26, 2010, plaintiff and her daughter reported that plaintiff is able to tend to her personal needs, watch her grandchildren, fold laundry, walk, drive, pay bills, watch television, spend time with others, perform light housekeeping, and wash dishes. (Tr. 17-18, 281-99.)

**ALJ Hearing**

On April 17, 2013, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 95-116.) She has worked in hotel housekeeping and as a certified nurse's assistant. She has degenerative disc disease in her lumbar spine. She takes a muscle relaxant, Hydrocodone for pain, and Prozac for depression. (Tr. 98-101.)

She has a compression fracture at L4. She was diagnosed with osteopenia in 2010 and by 2011 it progressed to osteoporosis when her compression fracture occurred. It affects her neck and shoulders, and makes her legs go numb. (Tr. 103-105.)

She began mental health treatment in 2010. She hears a woman's voice, perhaps her mother's, calling to her at least once or twice a week. She has suicidal thoughts at least three times a month, triggered by being unhappy, not feeling good, and her inability to work. (Tr. 105-06.)

She cannot perform much housework that requires repetitive bending. She has difficulty standing to clean dishes, because she must rest after five minutes of standing.

Sitting causes back pain and numbness in her legs from the knees down. She loses her balance upon standing and requires two hands to lift objects such as a gallon of milk. She has pain in both legs. She attempts to exercise by walking around her house although her legs get weak after five minutes. (Tr. 107-10.)

When she feels suicidal, she feels worthless and that there is no point in continuing. She sometimes cries, feels brokenhearted, and "down in the dumps." She was a CNA for 23 years before she injured her back lifting patients. She stopped doing CNA work and switched to housekeeping because she needed a break from being around so much death. She completed the 9th grade and has her GED. (Tr. 111-12.)

Vocational Expert Susan Shay also testified to the following. Plaintiff has no past relevant work (PRW) because all of her many jobs were of very short duration. The ALJ posed a hypothetical question about a person with an RFC who could perform light work, who could only occasionally climb, crawl, kneel, stoop, squat, reach overhead or bend. The vocational expert testified that jobs existed in the national economy that plaintiff could perform, including light cleaner or housekeeper, light laundry worker, and light machine tender.

The vocational expert testified that no jobs would be available if plaintiff were to miss more than two days of work per month, or if she missed any work in the first 90 days. Further, if the hypothetical individual required a sit/stand option at will for greater than five minutes at a time, the light jobs would be eliminated. (Tr. 115-16.)

### III.   DECISION OF THE ALJ

On April 24, 2013, the ALJ decided that plaintiff was not disabled. The ALJ found that plaintiff had severe impairments of degenerative disc disease of the lumbar spine and osteoporosis. (Tr. 12.) However, the ALJ found that she did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 14.) The ALJ determined that plaintiff retained the RFC to perform light work as defined in the regulations, except that she could only

occasionally climb, crawl, kneel, stoop, squat, reach over shoulder-level, and bend. (Tr. 14.) The ALJ found that plaintiff's impairments would not preclude her from performing work that exists in significant numbers in the national economy, including work as a light cleaner/housekeeper, light laundry worker, and light machine tender. (Tr. 20.) Thus, the ALJ found that plaintiff was not disabled. (Tr. 20.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits under both Title II and Title XVI of the Social Security Act, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3)

her condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform PRW. Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred at Step Two in finding that her medically determinable impairment of depression was not a severe mental impairment. She also argues the ALJ erred in evaluating her credibility and in misstating the vocational expert's testimony. This court disagrees.

**1. Step Two - plaintiff's mental impairment**

Plaintiff argues that the ALJ erred at Step Two in finding that her depression was not a severe impairment. She cites the record evidence demonstrating her history of mental illness, including two suicide attempts, and her testimony that she has continued thoughts of suicide at least three times per month and that she hears the voice of her dead mother once or twice a week.

A "severe" impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. See 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" encompass the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. §§ 404.1521(b), 416.921(b). Included are mental functions such as capacities for understanding, performing, and remembering simple instructions;

using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work situation. Id. While severity is not an onerous requirement for the claimant to meet, see Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989), it is also not a toothless standard, and the Eighth Circuit has upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing. See e.g., Page v. Barnhart, 484 F.3d 1040, 1043-44 (8th Cir. 2007); Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001).

In making his determination, the ALJ concluded that during the relevant period plaintiff's depression did not cause more than a minimal limitation in her ability to perform basic mental work activities and thus was not a severe impairment as defined by the Act. The ALJ considered that plaintiff did not seek treatment from a mental health professional during the relevant period. (Tr. 13.) See e.g., Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (affirming determination that mental issues were not severe where claimant sought very limited treatment, and such treatment was primarily for the purpose of obtaining benefits). The mere presence of a mental impairment does not mean that it is severe. See Buckner v. Astrue, 646 F.3d 549, 557 (8th Cir. 2011) (while claimant was diagnosed with depression and anxiety, substantial evidence on the record supported the ALJ's finding that his depression and anxiety was not severe).

Plaintiff notes her history of two suicide attempts. However, as the ALJ noted, these occurred approximately 20 years before her alleged period of disability. (Tr. 13, 334, 382.) Plaintiff also testified that she continued to have suicidal ideations approximately three times per month. However, she reported to consultative examiner Dr. Henry that she had no recent suicide ideation. (Tr. 364.) Although the record demonstrates that plaintiff took psychotropic medications as prescribed by general practitioners, this alone is not evidence to show that plaintiff has a severe mental impairment. Cf., Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (prescription of antidepressants does not demonstrate that the claimant is disabled).

Plaintiff also notes that social worker Oliver diagnosed her with major depression and panic disorder, and assessed her GAF at 45 and 50. Dr. Goldman signed the assessments and completed state forms on which he opined that plaintiff was permanently disabled for Medicaid purposes. (Tr. 352-54, 399-402.) The ALJ considered these assessments, but gave them little weight, finding that the assessments were inconsistent with the treatment notes and the overall record. (Tr. 13, 19.) See e.g., Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (ALJ may discount any treating physician opinion which is inconsistent with the evidence as a whole). Dr. Goldman was not a treating source. Moreover, a disability determination by any other governmental agency is based on its rules, not social security law, and therefore is not binding on the Commissioner. See 20 C.F.R. §§ 404.1504, 416.904. See also Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996) (whether claimant is disabled under state law is not binding on Commissioner); Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996) (disability determination by VA is not binding on ALJ).

At her first evaluation, plaintiff reported a history of depression since childhood, but said she had never received treatment from a psychiatrist. She showed a flat affect, depressed mood, poor recent memory and concentration, and monotonous speech, but normal hygiene, fair remote memory, normal judgment and insight, and average intellect. (Tr. 13, 353-54.) The second evaluation revealed that plaintiff was slightly withdrawn with a bland affect and somewhat monotonous speech. However she was fully oriented, her thoughts were clear and goal directed, her insight and judgment were normal, there was no psychomotor agitation or retardation, and her concentration was fair, as was both recent and remote memory. (Tr. 13, 399). The ALJ properly found that such findings did not support the opinions of Mr. Oliver and Dr. Goldman that plaintiff had serious limitations.

Plaintiff argues her history of GAF scores below 50 is evidence of a severe impairment, citing Pate-Fires in support. According to the Diagnostic and Statistical Manual of Mental Disorders (DSM), the GAF scale is intended for use by practitioners in

making treatment decisions. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32-33 (4th ed.-Text Revision 2000) (DSM-IV). However, the most recent version of the DSM dropped GAF from inclusion because of its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." <u>DSM-V</u> 16 (5th ed. 2013).

Moreover, neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score. In fact, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." <u>See</u> 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000).

While the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs, GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning. <u>See</u> <u>Halverson v. Astrue</u>, 600 F.3d 922, 930-31 (8th Cir. 2010) (GAF score may be of considerable help in formulating RFC, but is not essential to RFC's accuracy). GAF scores may also be considered by the ALJ when considering weight to be given a treating doctor's opinion and whether the doctor's opinion is inconsistent with treatment record. <u>Myers v. Colvin</u>, 721 F.3d 521, 525 (8th Cir. 2013).

This court agrees with the ALJ's determination that the opinions of Mr. Oliver and Dr. Goldman were not supported by the evidence. The ALJ further noted that treatment notes during the relevant period documented only minimal complaints of depression with virtually no abnormal objective mental status examination findings. (Tr. 13.) The ALJ noted that plaintiff had no complaints of depression during appointments with her other doctors in July and October 2011, or in 2012. (Tr. 13, 408, 411, 414, 417.) Objective findings showed plaintiff was alert and in no acute distress, and no psychiatric abnormalities were documented. (Tr. 13, 405, 409, 412.) During an August 29, 2012

office visit, plaintiff requested medication for anxiety and sleep, while examination showed she was alert and in no acute distress, and no psychiatric abnormalities were documented. (Tr. 13, 404-05.) The ALJ's finding that plaintiff did not have a "severe" mental impairment is supported by the record.

Furthermore, plaintiff told Mr. Oliver that she could no longer work due to physical health problems. At her hearing plaintiff's counsel similarly stated that her impairments were primarily physical. (Tr. 98, 399.) Cf. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (when an individual has worked with an impairment over a period of years, absent significant deterioration, the impairment cannot be considered disabling at present).

Finally, in making his Step Two evaluation, the ALJ conducted the analysis required by the regulations and found that plaintiff had no restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in concentration, persistence, and pace; and no episodes of decompensation of extended duration. The ALJ noted that plaintiff reported that she was able to tend to her personal care, watch her grandchildren, fold laundry, walk, drive, pay bills, and watch television. (Tr. 14, 281-91.) Although plaintiff stated that she did not like crowds, she spent time with others, including her family, and presented no other evidence that she had difficulty getting along with others. Plaintiff also reported being able to go out alone and did not need anyone to accompany her. While plaintiff indicated that she had difficulty with memory and with following instructions, she reported no problems with completing tasks, concentration, or understanding. (Tr. 14, 284-86.) This court concludes the ALJ properly found that plaintiff's depression was not vocationally significant. The undersigned concludes plaintiff failed to meet her burden to provide evidence that she had a severe mental impairment.

To the extent plaintiff contends that the ALJ erred in not ordering a mental consultative examination, this court disagrees. It is plaintiff's responsibility to provide medical evidence to show that she is disabled. See 20 C.F.R. §§ 404.1512, 416.912; Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) (claimant bears the burden of

proving disability and providing medical evidence as to the existence and severity of an impairment). The ALJ is required to order a consultative examination only if the medical records do not provide sufficient medical evidence to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1519a(b), 416.919a(b); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). The ALJ did in fact send plaintiff for a physical consultative examination, at which time Dr. Henry also performed a Mini-Mental Status Examination on which plaintiff achieved the maximum score possible. (Tr. 357-59.) The ALJ here was able to make a determination based on the evidence provided.

In making an RFC determination, the ALJ considers the effects of all medically determinable impairments, whether "severe" or not "severe." See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("[w]e will consider all of your medically determinable impairments...including your medically determinable impairments that are not 'severe'...when we assess your residual functional capacity"). In this case the ALJ did not end his inquiry at Step Two, but proceeded to Step Five. (Tr. 12-20.) The ALJ therefore accounted for any credible limitations resulting from plaintiff's mental impairments, had he found any, as well as limitations stemming from her physical impairments.

2. **Credibility Determination**

Plaintiff next argues the ALJ erred in evaluating her credibility. This court disagrees.

The ALJ is tasked with assessing the credibility of a claimant's subjective complaints. In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ need not explicitly discuss each Polaski factor,

the ALJ nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010).

If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court will normally defer to the ALJ's credibility determination. Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). Here, the ALJ noted plaintiff's testimony that she was unable to work due to back pain and osteoporosis that affected her neck and shoulders and that made her legs go numb. (Tr. 15-17, 100-05.) Plaintiff also complained of depression, hearing voices, and considering suicide. (Tr. 15, 105-06.) The ALJ noted, however, that the record evidence did not support plaintiff's allegations of disabling pain and limitations. See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (lack of objective medical evidence is a factor an ALJ may consider in determining a claimant's credibility). The ALJ noted that tests generally revealed only mild abnormalities, showing one occasion of spasm and one finding of tenderness over the sacrum, but otherwise reflecting full grip strength, normal upper and lower extremity strength, no scoliosis, no kyphosis, no deformity, no tenderness, full range of motion, no joint crepitus, no sensory loss, negative straight leg raise testing, no edema, and a normal gait. (Tr. 17, 366-67, 389, 405, 410, 413-14, 417, 420, 429.) Additionally, during her doctors' appointments, plaintiff was in no distress. (Tr. 17, 366, 405, 409, 412, 429.)

Moreover, the record evidence showed that plaintiff sought limited medical treatment for back pain. Plaintiff alleged a disability onset date of July 1, 2010, but did not seek treatment for back pain until October 19, 2010, and sought further treatment for back pain on only a few occasions. (Tr. 15-17, 384, 388, 404, 414, 417, 420.) See e.g. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) (if claimant's pain was as severe as alleged she would have sought regular medical treatment).

Plaintiff also contends the ALJ erred in discrediting her allegations because she did not seek regular medical treatment, yet regularly purchased cigarettes. The ALJ stated that even if plaintiff alleged that she was unable to afford treatment, the fact that she chose to spend her money on cigarettes rather than her health care would detract from any such

claim. (Tr. 17.) The Eighth Circuit has held that in considering a plaintiff's failure to seek treatment, an ALJ may properly consider whether there was any evidence the plaintiff had ever been refused medical treatment because of an inability to pay and whether the plaintiff made lifestyle changes such as foregoing purchases of cigarettes. Cf. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (in evaluating credibility of claimant's subjective complaints, it was permissible for the ALJ to consider the lack of evidence that claimant had sought out stronger pain treatment available to indigents); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (while claimant alleged he could not afford medication, there was no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking to help finance pain medication). The record here shows plaintiff had access to a free clinic and sought treatment there on occasion. (Tr. 384-98.)

The ALJ also noted that severe pain such as alleged by plaintiff often resulted in observable manifestations such as weight loss due to loss of appetite, weight gain from inactivity, muscular atrophy, muscular spasms, the use of assistive devices, prolonged bed rest, or adverse neurological signs, and that plaintiff showed no such manifestations. (Tr. 17.) The ALJ noted that while plaintiff complained of muscle spasms, the record evidence showed only one objective finding of such, and the remaining record evidence failed to demonstrate findings that would suggest pain of such severity as to prevent plaintiff from engaging in any work activity on a sustained basis. (Tr. 17, 389.)

Plaintiff further asserts that her doctors would not have prescribed muscle relaxants and pain medication unless she had a legitimate need. Here, the ALJ did not dispute that plaintiff has impairments. The question, however, is not whether a claimant is experiencing pain, but rather the severity of her pain. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Perkins v. Astrue, 648 F.3d 892, 903 (8th Cir. 2011).

The ALJ found that plaintiff's reported activities were inconsistent with her allegations of disabling pain and limitation. (Tr. 17-18.)  See e.g., Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (activities which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility).  The ALJ noted that plaintiff and her daughter reported that plaintiff is able to tend to her personal needs, watch her grandchildren, fold laundry, walk, drive, pay bills, watch television, spend time with others, perform light housekeeping, and wash dishes.  (Tr. 17-18, 281-99.)  Plaintiff also reported to the consultative examiner that she was capable of light housekeeping and caring for her personal needs.  (Tr. 365.)  The ALJ also noted that in October 2011, plaintiff reported to Dr. Wells that she had recently hurt her back helping to lift an oxygen tank out of the bed a pickup truck.  (Tr. 414.)

The ALJ also considered that none of plaintiff's treating doctors placed any restrictions on her or stated that she was unable to work.  (Tr. 18.)  Moreover, none of plaintiff's examining physicians placed any limitations on her consistent with disability.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability).  Following a physical exam, consultative examiner Dr. Henry opined that plaintiff would be capable of sustaining a 40-hour workweek on a continuous basis and that she would have no restrictions on her ability to complete mild to light demand activities.  Dr. Henry believed that plaintiff had the upper extremity strength to accomplish light work without difficulty and that she would have no restrictions in her ability to sit.  Due to her alleged discomfort with bending, Dr. Henry recommended "very light" demand duties with regard to bending and lifting.  (Tr. 367.)

The ALJ gave Dr. Henry's opinion great weight based on his examination of plaintiff, as well as the support contained in his findings and report.  (Tr. 18.)  The ALJ further found Dr. Henry's opinion was consistent with the objective findings in the record, which showed full grip strength, normal extremity strength, no scoliosis, no tenderness, no

deformity, full range of motion, no joint crepitus, no sensory loss, negative straight leg raise testing, and a normal gait. (Tr. 18, 366-67, 389, 405, 410, 413-14, 417, 420, 429.)

As to plaintiff's mental limitations, psychologist Dr. Altomari opined that plaintiff retained the ability to understand, remember, and carry out complex instructions, could relate appropriately to coworkers and supervisors in small numbers and for brief periods, could adapt to most usual changes common to a competitive work environment, and could make simple work-related decisions. (Tr. 18, 371.) While the ALJ is not bound by any findings made by state agency psychiatrists or psychologists, such doctors are highly qualified doctors who are also experts in Social Security disability evaluations, and the ALJ is required to consider their findings. See 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). Here, the ALJ gave "some" weight to his opinion but found that the evidence indicated plaintiff was less limited that Dr. Altomari believed. (Tr. 18.) Specifically, as discussed above, the ALJ noted plaintiff's failure to seek treatment for her depression from a specialist and the record evidence documenting that she had no change in her mental status. (Tr. 19.) See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in plaintiff's mental capabilities disfavors finding of disability). Nonetheless, Dr. Altomari's opinion does not support plaintiff's allegations of disabling mental limitations. Further, as discussed above, the ALJ considered Dr. Goldman's opinion that plaintiff's mental impairments were disabling, but properly gave it little weight because it was not supported by the record evidence and was merely expressed on a state agency form for that agency's purposes. (Tr. 19.) Accordingly, the undersigned concludes that the ALJ properly gave Dr. Goldman's opinion little weight.

This court concludes that the ALJ properly evaluated plaintiff's credibility and found her allegations of disability not credible.

### 3. Vocational Expert's Testimony

Plaintiff next argues that the vocational expert's testimony does not support the ALJ's determination that she was capable of performing light work in light of her additional limitations, such as standing for no more than five minutes. The undersigned disagrees. The hypothetical question posed by the ALJ included only those impairments and restrictions that the ALJ found to be credible. (Tr. 114-15.) See Heino v. Astrue, 578 F.3d 873, 882 (8th Cir. 2009) (although the hypothetical question must set forth with reasonable precision the claimant's impairments, it need only include those impairments and limitations found credible by the ALJ); Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (discredited complaints of pain are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them). Here because the hypothetical question included those impairments the ALJ found credible, and excluded those he discredited for legally sufficient reasons, the vocational expert's testimony that plaintiff could perform work existing in substantial numbers was substantial evidence in support of the ALJ's determination. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011); Gragg v. Astrue, 615 F.3d 932, 941 (8th Cir. 2010).

### VI. CONCLUSION

Substantial evidence on the record as a whole supports the ALJ's finding that plaintiff could perform work as a light cleaner/housekeeper, light laundry worker, and light machine tender. For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 21, 2015.